UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| JONATHAN ADAMS THOMAS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 5:12-CV-106 |
| | § | |
| JEH JOHNSON, | § | |
| | § | |
| Defendant. | § | |

## **MEMORANDUM AND ORDER**

Plaintiff Jonathan Adams Thomas brought suit against the Secretary for the United States Department of Homeland Security under Title VII,[1] alleging that his employment as a Border Patrol Agent Intern was terminated "due to [his] race (African American) and color (Black)."  *See* Dkt. No. 27, Attach. 1 at ¶ 5.  Now pending before the Court is Defendant's Motion for Summary Judgment (Dkt. No. 63).  Plaintiff filed a Response in opposition to Defendant's Motion (Dkt. No. 65) and Defendant filed a Reply in support of his Motion (Dkt. No. 68).  Because Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's termination and Plaintiff has not pointed to substantial evidence indicating that the reason was a pretext for unlawful discrimination, Defendant's Motion for Summary Judgment (Dkt. No. 63) is hereby **GRANTED**.

---

[1] In addition, Plaintiff brought suit under 42 U.S.C. § 1981.  The Court notified the Parties that it was considering granting summary judgment for Defendant on Plaintiff's § 1981 claims because Plaintiff cannot bring those claims against a federal employer, *see* Dkt. No. 73, and Plaintiff responded with his Unopposed Motion to Withdraw 42 U.S.C. § 1981 Claims (Dkt. No. 74). Plaintiff's Motion (Dkt. No. 74) is hereby **GRANTED**.

I.   FACTS[2]

Plaintiff worked for the Laredo Sector of the United States Border Patrol ("BP") as a Border Patrol Agent Intern ("BPA(I)") from October 30, 2008, until he was terminated on October 25, 2010.   *See* D Ex. 1; D Ex. 4; D Ex. 10 at 7:23–25.[3]   As a BPA(I), Plaintiff underwent a two-year probationary period during which he could be terminated without the procedural protections given to a permanent Border Patrol Agent ("BPA").   D Ex. 4; D Ex. 34 at 10:22–12:2.   His termination followed multiple investigations into a possible hazing incident that occurred on April 13, 2010 at the Hebbronville, Texas checkpoint ("the checkpoint").

### A. Checkpoint Incident

On the date in question, Plaintiff was partnered with BPA Humberto Salinas for the day.[4]   D Ex. 12 at 3:97–4:111.   At about 12:40 p.m., BPA Jose Munoz called Salinas and asked him to address some new interns regarding physical training at the checkpoint, *see* P Ex. 14 at 85–86; D Ex. 16 at 717:8–10, and Plaintiff and Salinas arrived at the checkpoint around 1:00 p.m., D Ex. 16 at 717:11–12.

Upon their arrival, Plaintiff and Salinas joined a group of about twelve agents and greeted Munoz, BPA Roberto Gomez, and BPA(I)s Rene Galarza and Ulises Moreno.   *See* D Ex. 13 at 2:45–3:66.   Galarza and Moreno started working as BPA(I)s the day before, and they had not yet attended the Border Patrol Academy

---

[2] The Court presents the facts in the light most favorable to Plaintiff, the non-movant.   *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004).

[3] "D Ex." refers to the exhibits attached to Defendant's Motion for Summary Judgment (Dkt. No. 63), and "P Ex." will refer to the exhibits attached to Plaintiff's Response (Dkt. No. 65).

[4] BPA(I)s were required to ride along with "senior agents" during their probationary period. P Ex. 13 at 18:2–20.

("Academy"). *See* D Ex. 17 at 589; P Ex. 4 at 21:1–22:12. Munoz and Gomez were tasked with showing Galarza and Moreno the checkpoint that day. *See* D Ex. 11 at 781.

After their greeting, Munoz and Gomez briefly took Galarza and Moreno inside the checkpoint trailer before taking them back outside behind the trailer.[5] P Ex. 10 at 14:3–16:12. Salinas then led a physical training session where Salinas, Galarza, and Moreno did push-ups, sit-ups, and flutter kicks. *See* D Ex. 11 at 778:70–73, 781–82; P Ex. 3 at 24:10–12. Munoz, Gomez, and a group of about five to fifteen other agents watched them perform these exercises. *See* P Ex. 3 at 24:18–25:6; P Ex. 10 at 32:1–10. After about fifteen minutes, BPA Rene Tabasco arrived with a group of BPA(I)s who had recently completed training at the Academy. *See* D Ex. 14 at 191; P Ex. 21. The post-Academy BPA(I)s joined the exercises for about five to ten minutes, after which the session ended. *See* D. Ex. 14 at 191–92. Salinas then returned to his vehicle where Plaintiff was already waiting. *See* P Ex. 14 at 85.

## B. Investigations into the Checkpoint Incident

Galarza and Moreno arrived at the Academy in Artesia, New Mexico, the next day. *See* D Ex. 14 at 195; D Ex. 17 at 589. On April 16, 2010, Academy personnel informed officials in the Laredo Sector that Galarza and Moreno had been diagnosed with rhabdomyolysis, a serious breakdown of muscle fiber into the bloodstream, following the checkpoint incident. *See* D Ex. 17. Three different

---

[5] The Hebbronville checkpoint consists of a trailer, inspection lanes where agents inspect vehicles coming through the checkpoint on the highway, some dog kennels, and a small grassy area behind the trailer. *See* D Ex. 16 at 721:20–24; D Ex. 33; D Ex. 36; D Ex. 37; P Ex. 30.

entities then began investigations at different times: Laredo Sector Evidence Team ("SET"), Immigration and Customs Enforcement Office of Professional Responsibility ("OPR"), and Customs and Border Protection Internal Affairs ("IA").

### i.    Laredo Sector Evidence Team (SET)

After learning of Galarza and Moreno's injuries, Rosendo Hinojosa, Chief Patrol Agent of the Laredo Sector, launched an investigation into the checkpoint incident headed by Roberto Santos, his Assistant Chief Patrol Agent. D Ex. 17 at 589. The investigation began with a request for memos from agents present at the checkpoint on April 13. *See* D Ex. 9 at 158. Munoz and Gomez submitted memos separately on April 16, 2010, Salinas submitted a memo on April 18, 2010, and Plaintiff and Tabasco submitted memos separately on April 19, 2010. *See* D Ex. 11 at 781–82; D Ex. 18; P Ex. 12; P Ex. 21; P Ex. 28. Plaintiff's memo states, in pertinent part: "When we arrived at the checkpoint, I was introduced to the new interns and then went inside to check my government email. I did not witness and unaware [sic] of anything that went on outside of the checkpoint." D Ex. 18.

On April 19, 2010, SET officials obtained videos from the checkpoint. D Ex. 9 at 158. The videos did not show the area behind the trailer where the physical training session occurred. *Id.* Among the videos, however, was footage from inside the trailer depicting Plaintiff walking in and then immediately out of the trailer twice, never checking or attempting to check his e-mail on the computer workstations inside. *See* D Ex. 36 at 2:24–26.[6]

---

[6] The timestamps on Defendant's Exhibit 36 appear to be one hour ahead of when the events depicted actually occurred. *See* D Ex. 34 at 74:18–77:6.

On April 21, 2010, Santos and Supervisory BPA Francisco Villarreal interviewed Galarza and Moreno individually at the Academy. P Ex. 3 at 1; P Ex. 10 at 1. Galarza's account of the physical training session included, among other things, "a black African-American agent" approaching him during the exercises "looking at [him] and [his] tattoos" and asking, "what's wrong with you . . . [,] are you [a Mara?]" *See* P Ex. 3 at 27:9–18. Galarza understood "Mara" as a reference to the Mara Salvatruchas, a Salvadorian prison gang. D Ex. 15 at 272. Moreno's account included, among other things, an agent making a comment about Galarza's tattoos and how "the [Mara] didn't train him right." *See* P Ex. 10 at 32:20–33:3, 33:21–34:2. Moreno stated that he did not remember the agent's name, but that the agent was "dark colored" and that he would describe the agent as African American. *See id.* at 33:5–15.

Following Galarza and Moreno's interviews, SET members tentatively identified Plaintiff, who was the only African-American agent within the Laredo Sector assigned to the Hebbronville Station, as the agent who commented on Galarza's tattoos. *See* D Ex. 9 at 159; D Ex. 20; D Ex. 34 at 47:11–24; P Ex. 53 at 78:17–79:8. On April 26, 2010, the Customs and Border Protection Office of Information Technology informed SET that they found no evidence of Plaintiff accessing his e-mail in the checkpoint trailer on April 13. *See* D Ex. 21.

Plaintiff, Salinas, Munoz, and Gomez were all placed on administrative duties pending the SET investigation. *See* D Ex. 17 at 590. Dissatisfied with this and having heard that other interns were submitting memos regarding their

physical training beyond the April 13 incident, Plaintiff submitted an unsolicited memo to SET on May 6, 2010, reiterating the substance of his earlier memo and discussing the physical training he underwent after he was hired. *See* D Ex. 22; P Ex. 13 at 80:25–81:21.

On May 11, 2010, Hinojosa sent BP Chief Michael Fisher a memo updating him on the status of the investigation and the actions that the Laredo Sector had taken up to that point. *See* D Ex. 17. Hinojosa stated that Plaintiff "was implicated for allegedly making inappropriate comments to Intern Galarza (reference some of Galarza's tattoos)." *See id* at 169. He stated that SET had "evidence that contradicts information on [Plaintiff's] memorandum (lack of candor)," and that Plaintiff was therefore placed on administrative duties pending the investigation's conclusion. *See id.*

Hinojosa also stated that Munoz and Gomez "admitted to allowing [Galarza and Moreno] to participate in physical training (against Service and Sector policy)." *See id.* Furthermore, he pointed out an inconsistency between their account of the checkpoint incident and the accounts given by Galarza and Moreno: Munoz and Gomez claimed that Galarza and Moreno volunteered to participate in physical training while Galarza and Moreno denied volunteering. *See id.* He concluded by stating that OPR had begun an investigation, and that SET had provided OPR with all of the evidence they had obtained thus far. *See id.* at 171.

### ii.   Immigration and Customs Enforcement
###        Office of Professional Responsibility (OPR)

On May 3, 2010, OPR Special Agents met with Santos to discuss the checkpoint incident.  P Ex. 32.  In their conversation, Santos stated that Galarza and Moreno reported that Plaintiff was the one who commented on Galarza's tattoos during the incident.  *Id*.

OPR interviewed Galarza and Moreno separately in June of 2010.  *See* D Ex. 14; D Ex. 15.  They gave essentially the same accounts of the checkpoint incident that they gave to SET.  When asked who made the comments about his tattoos, Galarza replied that he did not recall the agent's name, but that the agent was a "short black guy."  *See* D Ex. 15 at 271.  When asked if he knew Plaintiff, he replied that he did not, "but based on the information provided to [him] by ICE agents, [Plaintiff] is the one who made the comments about [his] tattoos."  *See id*.

Also in June, OPR interviewed five post-Academy interns who participated in the April 13 physical training session.  *See* D Ex. 24.  All of them stated that the session was voluntary and that they were not ordered to participate.  *See id*. at 209, 220, 230, 248, 259.  They were also asked whether anybody made comments about an intern's physical appearance or tattoos during the session.  Some of them stated that they did not remember any comments of the sort and others stated that no comments of the sort were made.  *See id*. at 213, 223, 234, 251, 262.

OPR issued a report of investigation on June 30, 2010.  *See* P Ex. 33.  The report set out the details of OPR's investigation and ultimately concluded that no

evidence of criminal misconduct was discovered.  *See id.* at 2349.   OPR then transferred the case to IA.[7]  *See* D Ex. 26; D Ex. 27.

### iii.   Customs and Border Protection Internal Affairs (IA)

Special Agent John Berent led IA's investigation of Plaintiff, Salinas, Gomez, and Munoz.  *See* D Ex. 26 at 2159; D. Ex. 27.   Berent, who was in the Houston IA office, maintained contact throughout the investigation with Special Agent Vittorio Ramirez, who was in the Laredo IA office, and Santos.  *See* P Ex. 38; P Ex. 39; P Ex. 40; *see also* P Ex. 5 at 209:11–215:18.

IA agents interviewed Plaintiff on August 9, 2010.  *See* D Ex. 13.   Plaintiff reiterated that he was not present at the physical training session on April 13.  *See id.* at 304–05.   When asked about the statement in his first memo that he entered the checkpoint trailer to read his e-mail, he clarified that he "entered the checkpoint with the intention to read [his] government e-mail but decided not to when [he] noticed that no one else was inside."  *See id.* at 306:113–14.   He stated that after he walked back outside of the trailer, he spoke with several other agents (whose names he could not recall) until he left with Salinas.  *See id.* at 304:50–305:59.

Galarza and Moreno were interviewed separately a few days later.  *See* D Ex. 29; D Ex. 30.   Galarza described the agent who commented on his tattoos as "African American, short, and stocky."  *See* D Ex. 29 at 312:49–52.   He stated that while he was doing sit-ups, the agent walked up to him and asked him if he was a Mara.  *See id* at 313:60–67.   Before that, he heard someone yell out, "[w]hat

---

[7] OPR investigates criminal misconduct and IA investigates internal policy violations within Customs and Border Protection.  *See* D Ex. 34 at 55:25–56:2.

happened, didn't the Maras train you right?"  *See id.* at 313:69–70.  Galarza stated that he did not remember whether these comments were made before or after the post-Academy BPA(I)s arrived.  *See id.* at 313:72–77.  Finally, the interviewer showed Galarza a photographic line-up of six African-American agents and asked him if he could identify the agent who made the comments.  *See id.* at 313:93–98. Plaintiff's photo was in the line-up, but Galarza stated that he could not identify the agent from among the group.  *See id.*

Moreno stated that the agent who commented on Galarza's tattoos was "African American and of medium built [sic]," and that the agent "was the only African American [agent he and Galarza] saw at the Hebbronville USBP Station at that time."  *See* D Ex. 30 at 324:45–48.  He stated that while he and Galarza were doing push-ups, the agent leaned down and said, "[w]hat's wrong, didn't the Mara Salvatruchas train you well?"  *See id.* at 324:56–325:75.  He also stated that he could not remember whether the comment was made before or after the post-Academy BPA(I)s arrived.  *See id.* at 325:66–68.  The interviewer then showed Moreno the same photographic line-up shown to Galarza.  Moreno stated that he "believe[d] it [was] the individual in picture #1," which was not Plaintiff's photo. *See id.* at 325:90–96.

Finally, IA interviewed Munoz and Salinas in early September of 2010.  *See* D Ex. 11; D Ex. 12.  Munoz stated that he did not hear any agents make inappropriate comments about Galarza's tattoos on April 13.  *See* D Ex. 11 at 359:113–18.  Salinas said the same thing, and also said that he did not remember

seeing Plaintiff during the physical training session that day. *See* D Ex. 12 at 372:87–90, 372:97–373:108.

Berent issued Plaintiff's IA report of investigation on September 30, 2010. *See* D Ex. 19.  Berent summarized the evidence gathered by IA, stating that while "Galarza and Moreno reported an unknown African American BPA[] had made the tattoo comments" and Plaintiff was "the only African American at the Hebbronville Station," Galarza and Moreno "did not recognize [Plaintiff] in a photo line-up."  *See id.* at 179.   He concluded by stating that he did not anticipate any further investigation from his office, and he closed the case.  *See id.*

### C. Post-Investigations

On October 1, 2010, Hinojosa terminated Galarza.  *See* P Ex. 24.  In Galarza's termination letter, Hinojosa stated that during the IA investigation, Galarza denied ever having joined any gangs.  *See id.*  However, Galarza submitted a written statement admitting that he had been "jumped" into a local gang called the "East Side," and subsequently admitted that he was "not completely honest when [he] was first questioned by CBP/IA Investigators regarding [his] gang affiliation." *Id.*  Thus, Hinojosa stated that Galarza was being terminated because his conduct indicated "a lack of candor, a lack of good judgment, [and a lack of] personal integrity, and demonstrate[d] that [he did] not meet the qualifications for continued employment in a law enforcement position" with BP.  *See id.*

On October 25, 2010, Hinojosa terminated Plaintiff.  *See* D Ex. 1.  Hinojosa pointed out how Plaintiff's story evolved throughout the investigations, and then

stated that "[g]iven the layout of the checkpoint and the area where the physical training exercise incident took place," he found Plaintiff's claim that he was unaware of the physical training session "nothing short of incredible." *See id.* at 112–13.   Hinojosa also stated that he did not believe Plaintiff would leave his assigned duty area to go to the checkpoint without inquiring about the purpose of the trip,[8] and that he would be unaware of his partner's whereabouts while at the checkpoint.   *Id.* at 113.   Finally, he stated that other agents attested to hearing Plaintiff make comments about Galarza's tattoos during the session.   *See id.* Hinojosa concluded by stating that he was terminating Plaintiff because the situation indicated "a lack of candor, a lack of good judgment, a lack of personal integrity, and demonstrate[d] that [Plaintiff did] not meet the qualifications for continued employment in a law enforcement position" with BP.   *See id.*

Hinojosa left the Laredo Sector in December of 2010 and took another position within Customs and Border Protection.   *See* D Ex. 34 at 51:23–52:3.   John Esquivel, Hinojosa's replacement, disciplined Salinas, Gomez, and Munoz in March and April of 2011.   Salinas received a two-day suspension, Gomez received a two-day suspension, and Munoz received a three-day suspension, all for failing to follow applicable laws, rules, regulations, or policies.[9]   *See* P Ex. 7; P Ex. 8; P Ex. 9.

---

[8] Both Plaintiff and Salinas testified during the EEOC proceedings that Salinas never told Plaintiff about the purpose of their trip, *see* D Ex. 16 at 715:10–16, 724:3–17; P Ex. 16 at 758:4–15; *see also* P Ex. 14 at 86, but it appears that neither of them were asked about this in the investigation materials that were before Hinojosa when he terminated Plaintiff.

[9] Esquivel also terminated Moreno in February of 2011 because he was unable to attend the Academy and complete the requisite training due to the injuries he sustained in the April 13 physical training session.   *See* P Ex. 23.

## II.   LEGAL STANDARD

Summary judgment is appropriate if the moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material when its truth or falsity "might affect the outcome of the suit under the governing law." *See id.*

Title VII makes it unlawful for any employer "to discharge any individual, or otherwise to discriminate against any individual . . . , because of such individual's race [or] color."[10]  *See* 42 U.S.C. § 2000e-2(a)(1).  To survive summary judgment, a Title-VII plaintiff seeking to prove discrimination with circumstantial evidence "must satisfy the burden shifting test annunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination.  *Id.*  If the plaintiff does so, the burden shifts to the defendant to produce evidence that it took action against plaintiff for a

---

[10]  In addition to his his claim of race discrimination, Plaintiff brings a claim of color discrimination.  The Parties do not distinguish between the two in their filings.  Claims of color discrimination are expressly contemplated in Title VII, but "there is hardly any Fifth Circuit case law" dealing with such claims.  *Taylor v. Tex. S. Univ.*, No. 4:12-CV-1975, 2013 WL 5410073, at *8 (S.D. Tex. Sept. 25, 2013).  "Courts outside this Circuit that have considered claims of color discrimination have generally held that '[c]olor discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual.'"  *Id.* (quoting *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 n.5 (4th Cir. 2002)).

legitimate, nondiscriminatory reason. *Id.* Finally, if the defendant does so, then the burden shifts back to the plaintiff to "offer sufficient evidence to create a genuine issue of material fact either [1] that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or [2] that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive alternative)." *Rachid*, 376 F.3d at 312.

The framework's purpose is "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," which is the ultimate issue in a Title-VII discrimination case. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981). The framework governs the order in which evidence is presented, but "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

## III.  ANALYSIS

### A. *Prima Facie* Case

The function of a *prima facie* case in Title-VII litigation is to "eliminate[] the most common nondiscriminatory reasons for" adverse actions taken against the plaintiff. *See Burdine*, 450 U.S. at 253–54. Establishing a *prima facie* case is "not onerous," *id.* at 253, and measuring whether a plaintiff has done so "is necessarily a

flexible standard that must be adapted to the factual circumstances of the case," *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012).

Generally, a plaintiff establishes a *prima facie* case if he produces evidence that he "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, . . . that others similarly situated were treated more favorably." *Okoye*, 245 F.3d at 512–13. As an alternative in work-rule violation cases, a plaintiff may establish a *prima facie* case by creating a genuine dispute over whether he actually committed the violation that purportedly led to the adverse action about which he complains. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995); *see also Turner*, 675 F.3d at 892–93; *Belgrave v. Splendora Ind. Sch. Dist.*, No. H-07-1704, 2008 WL 4020035, at *5 (S.D. Tex. Aug. 29, 2008).

While neither side in this case has pointed to a specific rule in an employee handbook stating that agents must exhibit candor in the course of their employment, it still appears that this was essentially a rule governing all agents. Hinojosa characterized lack of candor as a "termination offense," *see* D Ex. 34 at 105:5–7, and Defendant presented a chart of Hinojosa's past termination decisions wherein "lack of candor" is a category under the offense column, *see* D Ex. 3 at 406. Because the requirements of a *prima facie* case are flexible, this case is appropriately treated as a work-rule violation case even if Plaintiff was not terminated for violating a formal, codified rule.

14 / 30

Under the work-rule violation alternative, Plaintiff has created a genuine dispute over whether he was aware of the physical training session while at the checkpoint on April 13 and, *ipso facto*, whether he lacked candor when he denied awareness during the investigations. Plaintiff stated that he was not present, and Salinas stated that he does not remember Plaintiff being present, during the session. He and Salinas also stated that Plaintiff never asked why and Salinas never told him why they were going to the checkpoint that day. Galarza and Moreno did not identify him as the agent who made the alleged tattoo comments when IA agents presented them with a line-up that included Plaintiff's photo. Furthermore, he has set forth a reasonable argument that it was possible someone present at the checkpoint during the incident would not necessarily have been aware of the physical training session given the layout of the checkpoint and the fact that it was raining that day, which may have made it difficult to hear anything going on behind the trailer. Collectively, these are enough to establish a *prima facie* case. *See Mayberry*, 55 F.3d at 1091 (holding that a plaintiff machine operator, who was suspended after an accident, established a *prima facie* case under the work-rule violation alternative when he produced evidence that the machine he operated had malfunctioned in the past and submitted an affidavit stating that he was not responsible for the accident).

## B. Defendant's Proffered Reason

Because Plaintiff has established a *prima facie* case of discrimination, the burden shifts to Defendant to provide a legitimate, nondiscriminatory reason for

Plaintiff's termination.  By establishing a *prima facie* case, a Title-VII plaintiff has "in effect create[d] a presumption that the employer unlawfully discriminated against" him.  *Burdine*, 450 U.S. at 254.  But the defendant employer rebuts this presumption by producing evidence that he took a certain course of action for a legitimate, nondiscriminatory reason.  *See id.*  The defendant need not convince the court that his proffered reason actually motivated his decision; his burden is one of production, not persuasion.  *See McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

In Plaintiff's termination letter, Hinojosa stated that he did not believe that Plaintiff was unaware of the physical training session while he was at the checkpoint on April 13.  He stated that he was terminating Plaintiff for lack of candor, good judgment, and personal integrity.   Furthermore, all of the correspondence and internal records before Plaintiff's termination and Hinojosa's testimony after Plaintiff's termination support that he was terminated for those same reasons.  Thus, Defendant has satisfied his burden of production.  *See Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (holding that a defendant employer satisfied its burden by producing a termination form with a legitimate reason for the plaintiff's termination and a supervisor's deposition testimony stating that the plaintiff was terminated for that reason).

## C. Pretext

Finally, because Defendant has rebutted the *prima facie* case's presumption of discrimination by producing evidence that Plaintiff was terminated for a

nondiscriminatory reason, the burden shifts back to Plaintiff to show that the reason is either a pretext for discrimination or that a motivating factor in the decision to terminate him was his race or color.  Plaintiff's Response indicates that he is proceeding under the pretext alternative.

When a plaintiff proceeds under the pretext alternative, the issue at the final stage of the *McDonnell Douglas* framework is whether the defendant's proffered reason is the real reason for the action it took against the plaintiff.  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).  "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

To meet his burden, a plaintiff "must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination."  *Id.*; *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) ("Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination.").  At the pretext stage, a court still considers evidence that the plaintiff produced to make a *prima facie* case.  *See Reeves*, 530 U.S. at 143.  But taken together, the evidence he produces must be substantial to survive summary judgment because "if the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, a [factfinder] cannot reasonably infer discriminatory

intent." *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 370 (5th Cir. 1997), *overruled on other grounds by Reeves*, 530 U.S. at 133; *see also Fuentes v. Postmaster  Gen. of U.S. Postal Serv.*, 282 F. App'x 296, 302–03 (5th Cir. 2008) (per curiam); *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402–03 (5th Cir. 2001) ("To carry [his] burden, the plaintiff must produce substantial evidence of pretext[.]  Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." (internal quotation marks omitted)).

Plaintiff has offered evidence that he believes shows both disparate treatment and that Defendant's proffered reason is false or unworthy of credence. First, he argues that other non-African-American and nonblack BPAs and BPA(I)s involved in the checkpoint incident were treated more favorably.[11]   Second, he argues that Defendant's proffered reason is false or unworthy of credence because Santos, not Hinojosa, was the real decisionmaker and Santos harbored discriminatory animus against Plaintiff.   Third, he argues that Defendant's proffered reason is false or unworthy of credence by pointing to the evidence obtained during and following the investigations indicating that Plaintiff was not actually aware of the physical training session while he was at the checkpoint.

### i.   *Disparate Treatment*

"Disparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct."

---

[11] Plaintiff discusses disparate treatment in the context of his *prima facie* case, but as stated above, the Court considers evidence from both the *prima-facie*-case stage and the pretext stage in deciding whether a plaintiff has met his burden at the pretext stage.

*Vaughn*, 665 F.3d at 637; *see also Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals."). A plaintiff is generally not similarly situated with another employee if they had different supervisors, worked for different divisions of a company, or were subject to adverse employment actions too remote in time from one another. *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). A plaintiff is not similarly situated with another employee if they had different work responsibilities or were subjected to adverse employment actions for dissimilar violations. *Id.* at 259–60.

A plaintiff is similarly situated with another employee when they "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* In addition, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions" because if the difference in their conduct "*accounts for* the differences in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* Whether the conduct of a comparator is "nearly identical" turns on the comparable seriousness of the violation rather than how the employer characterizes the violation. *Id.*

Plaintiff attempts to compare himself with essentially every other agent at the checkpoint on April 13, 2010, to show disparate treatment. Defendant argues

that Plaintiff is not similarly situated with any of the permanent BPAs because he was a probationary employee, and that Plaintiff was not treated less favorably than any of the BPA(I)s with whom he was similarly situated.  To support his first point, Defendant cites cases from other circuits either holding that probationary employees are categorically not similarly situated with permanent employees or that probationary status is a relevant consideration when deciding whether two employees are similarly situated.[12]   Plaintiff simply counters by stating that whether two employees are similarly situated is a question of fact.

While the similarity of two employees' situations and conduct are questions of fact, whether a reasonable factfinder could conclude that the plaintiff is similarly situated to a comparator who engaged in nearly identical conduct is a question of law.  *See Wyvill v. United Co. Life Ins.*, 212 F.3d 296, 305 (5th Cir. 2000).  Even if Plaintiff's probationary status is merely a relevant consideration in the disparate treatment analysis, no reasonable factfinder could conclude that he was similarly situated with any of the permanent BPAs.

Plaintiff has not pointed to any evidence that his job, work responsibilities, or violation history were similar to those of any permanent BPAs at the checkpoint during the incident.  The only evidence the Court can find indicates that his job and work responsibilities were drastically different than those of a permanent BPA. BPA(I)s had to ride along with senior BPAs who had completed their probationary

---

[12] *Elgabi v. Toledo Area Reg'l Transit Auth.*, 228 F. App'x 537 (6th Cir 2007); *Green v. New Mexico*, 420 F.3d 1189 (10th Cir. 2005); *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005); *Steinhauer v. Degolier*, 359 F.3d 481 (7th Cir. 2004); *Bogren v. Minnesota*, 236 F.3d 399 (8th Cir. 2000); *Burgess v. Washington*, 199 F.3d 1331 (9th Cir. 1999); *Blanding v. Pa. State Police*, 12 F.3d 1303 (3d Cir. 1993).

periods while they were on patrol duty.  P Ex. 13 at 18:2–20.  Plaintiff also produced a handout that he received titled "Words of Wisdom for Interns," which indicates that in many ways, BPA(I)s were subservient to BPAs.  *See* P Ex. 52.  It instructs a BPA(I) to "[b]e a 'working ghost,'" to "[c]all a Senior Agent first," to "[k]eep your mouth shut" because "[n]obody can teach you anything if you are constantly talking," to "[n]ever make your FTO [Field Training Officer]/journeyman look bad," and to "[n]ever argue with your FTO/journeyman."  *See id.*

Hinojosa also testified that BPA(I)s were disciplined much differently than BPAs.[13]  *See* D. Ex. 34 at 57:13–16.  He testified that as a probationary employee, almost any transgression would lead to a BPA(I)'s termination  *Id.* at 37:22–38:2.  He had terminated BPA(I)s involved in vehicle accidents for not wearing a seatbelt because "[i]f we can't get you to do the minimum as an employee in the first two years when you are supposed to be showing us your best . . . , then, you know, there is a possible liability in some of those cases."  *Id.* at 38:3–12.  He testified that there was no way to discipline a BPA(I) with suspension (the punishment given to Salinas, Munoz, and Gomez in this case); a supervisor could only discipline a BPA(I) by terminating him.  *See id.* at 11:10–12:2.  Perhaps most importantly, he stated that BPA(I)s did not receive the same procedural protections from adverse employment actions afforded to permanent BPAs.  *See id.* at 39:1–7; *Jones v. Am. Airlines, Inc.*, 100 F.3d 953 (5th Cir. 1996) (per curiam) ("The non-probationary

---

[13] On summary judgment, a court should consider "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses," *Reeves*, 530 U.S. at 151, and a witness does not have an interest in an employment discrimination case merely because he was the decisionmaker, *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004).

employees to whom Jones points were not similarly situated because *they were protected by collective bargaining agreements*, they had different supervisors, and they had different employment records." (emphasis added)).   This uncontroverted evidence indicates that the job of BPA(I) was too dissimilar to the job of BPA for Plaintiff to compare his treatment with the treatment of any permanent BPAs.[14]

Plaintiff may therefore only attempt to compare himself to other BPA(I)s to show disparate treatment.   Again, it is his burden to show that he is similarly situated with his purported comparators, and he has not pointed to any evidence of comparable violation histories with the other BPA(I)s he offers as comparators.   But even if he had, the evidence produced during the investigations does not give rise to nearly identical suspicion of Plaintiff's candor versus the candor of his alleged comparators.

---

[14] Additionally, regardless of probationary status, Plaintiff cannot show disparate treatment by comparing himself to Salinas, Munoz, and Gomez.   Hinojosa made the decision to terminate Plaintiff, but Esquivel made the decision to suspend rather than terminate Salinas, Munoz, and Gomez following the checkpoint incident.   "[E]vidence regarding the treatment accorded fellow employees with different positions, different work histories, different kinds of violations, *or who were disciplined by different decisionmakers* is not sufficiently analogous for a reasonable factfinder to draw an inference of discriminatory intent." *Ramirez v. City of Odessa*, 38 F.3d 570 (5th Cir. 1994) (per curiam) (emphasis added); *see also Wyvill*, 212 F.3d at 305 ("[T]he striking differences between the two men's situations more than account for the different treatment they received. . . .   Most importantly, the decision-makers who disciplined [plaintiff] differed from those who were charged with deciding what action to take against [the alleged comparator]."); *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971, 983 (E.D. Tex. 2004) (stating that disparate treatment "generally requires a showing that a common supervisor was involved in the decision making" (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000))).   Discipline imposed by a different decisionmaker by its nature rarely carries any probative value when attempting to show discriminatory intent because different decisionmakers often exercise their discretion differently. *Cf. Radue*, 219 F.3d at 618.

As the Court will discuss in the next subsection, Plaintiff argues that Santos was the real decisionmaker in Plaintiff's termination.   Even if Santos did exert influence over the decision to terminate Plaintiff, the evidence only shows that he exerted influence insofar as he led one of the investigations that gathered facts Hinojosa relied on when he terminated Plaintiff.   Plaintiff does not argue that the facts were gathered more favorably in Salinas, Munoz, and Gomez's investigations, but merely that they received a more favorable outcome in the face of more serious conduct *as revealed by the investigations*.   Hinojosa chose the outcome in Plaintiff's case, and Esquivel chose the outcomes in Salinas, Munoz, and Gomez's cases.

Plaintiff argues that Moreno and Galarza, who are Hispanic, were treated more favorably because the statements they gave during the investigations were contradicted by the statements of others, yet their candor was not questioned. He points to the fact that Moreno stated in an OPR interview that the post-Academy BPA(I)s were "ordered" to join the physical training session while the post-Academy BPA(I)s stated that they joined voluntarily. He also points to the fact that Salinas, Gomez, and Munoz all stated that Galarza and Moreno volunteered to participate in the session while Galarza and Moreno denied volunteering.

Inconsistencies over the details to which Plaintiff points do not rise to the seriousness of the inconsistency with which the investigators faced regarding Plaintiff's presence during the session. Whether the interns affirmatively volunteered to participate was likely an important detail during the investigation; nonetheless, Galarza and Moreno's conduct was providing an apparent inconsistency over a detail of the incident whereas Plaintiff's conduct was providing an apparent inconsistency over his entire involvement in the incident. These are not nearly identical. Denying any involvement in the face of the evidence indicating his involvement (both from Galarza and Moreno's statements and from the checkpoint video) was more serious than providing a detail that was inconsistent with a detail given by other agents, especially given the stressful conditions under which Galarza and Moreno suffered during the session. The difference in Galarza and Moreno's conduct accounts for the fact that Plaintiff's candor was scrutinized

more carefully, and no reasonable factfinder could infer discriminatory intent based on the difference in scrutiny.[15]

### ii.    *Cat's Paw*

Next, Plaintiff argues that Santos harbored discriminatory animus and that he, not Hinojosa, made the decision to terminate Plaintiff.  To invoke "cat's paw," a concept wherein one co-worker's discriminatory attitude is imputed to a formal decisionmaker, a plaintiff must point to evidence sufficient to show "(1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker."  *Roberson*, 373 F.3d at 653.  Assuming that Santos exerted influence over Hinojosa, Plaintiff has not produced evidence that Santos exhibited any discriminatory animus.

First, Plaintiff points to three interactions Santos had with members of the other investigation teams.  On June 2, 2010, Villarreal sent OPR an e-mail, purportedly on Santos's behalf, asking whether OPR was going to interview Plaintiff because the Laredo Sector was "interested in taking a course of action with [Plaintiff] if a timely interview [was] not anticipated, given that he [was] still on internship status and [was] still assigned to administrative duties."  On July 1, 2010, Ramirez e-mailed Berent stating that Santos told him about the upcoming end of Plaintiff's two-year probationary period and that it was "very, very likely" that Plaintiff would be terminated "for his part in [the checkpoint incident] & not being totally honest."  And on August 3, 2010, somebody made an entry on

---

[15] Furthermore, Galarza's candor was questioned during the investigations.  He was ultimately terminated for lack of candor after he denied involvement with any gangs.  He received the same punishment as Plaintiff, termination, for the same reason, lack of candor.

Plaintiff's IA Case Chronology & Review Form stating that Santos "reported [the] need to talk to witnesses to 'place' subject at PT exercise."[16]  Plaintiff argues that these comments show Santos had focused the investigation on Plaintiff and that Santos had quickly made the decision to terminate Plaintiff.

Assuming that these pieces of evidence are admissible to prove that Santos in fact said these things, they cannot give rise to an inference of discriminatory animus.  The "interested in taking a course of action" and "very, very likely" comments cannot be understood as anything other than Santos trying to expedite and coordinate his investigation and Laredo Sector management's decision with the parallel investigations.  The purported comments facially contradict that they were made with discriminatory reasons in mind.  Laredo Sector management was inquiring about the progress of the IA investigation in June because Plaintiff was "still on internship status and [was] still assigned to administrative duties" after more than a month.  The July comment was made with the end of Plaintiff's probationary period in mind, and Santos thought his termination was "very, very likely" because of Plaintiff's part in the checkpoint incident and because Plaintiff was not totally honest.  The "place" comment was a short two-line entry in an activity log by an unknown person that provides no context of the purported conversation, and the comment by itself carries no probative value on the question of discriminatory animus.

---

[16] Some changes on form appear to be initialed "JB," indicating that the entries may have been made by John Berent.

Furthermore, nothing about the timing of Santos's comments could give rise to an inference of discriminatory animus.   A factfinder can reasonably infer discriminatory intent when an employer begins an investigation after it has made a predetermined decision to terminate an employee.   *See Laxton*, 333 F.3d at 582. But in this case, the first indication that Santos believed Plaintiff would be terminated came, at the very earliest, from the June "interested in taking a course of action" comment.   This comment was made a month and a half after the SET investigation had begun.   The fact that he may have wanted to take action in Plaintiff's case after that long says nothing about whether he harbored discriminatory animus.

Next, Plaintiff argues that Santos exhibited discriminatory animus by choosing to investigate Plaintiff but not choosing to investigate other BPAs working the inspection lanes at the checkpoint on April 13 who denied awareness of any improper physical training.   As stated above when discussing disparate treatment, Plaintiff cannot show discriminatory intent by comparing his treatment with the treatment of any permanent BPAs because he did not meet his burden of showing that he was similarly situated with any permanent BPAs.   This is true whether he is attempting to show discriminatory intent by Hinojosa or Santos.

Finally, Plaintiff appears to argue that Santos exhibited discriminatory animus because his justification for investigating Plaintiff changed over time.   He states that Santos "found the alleged comments about BPA(I) Galarza's tattoos to be racially motivated," that "[w]hen it became clear that there was little support for

the allegation that [Plaintiff] made racial comments during the hazing, Chief Santos turned the focus of the investigation to the unsupported claim that [Plaintiff] lacked candor," and that "[w]hen it became clear that that allegation was equally unsupported, Chief Santos did nothing."  To support this, he cites the OPR report of investigation from May 3, 2010, that states Santos said "both BPA(I) Moreno and Galarza reported that [Plaintiff] made racial and derogatory comments concerning BPA(I) Galarza's tattoos," *see* P Ex. 32, and the July 1, 2010, e-mail from Ramirez to Berent where he relays the "very, very likely" comment indicating that Plaintiff would probably be terminated for lack of candor, *see* P Ex. 39.

Again, none of this could possibly lead a reasonable factfinder to infer that Santos exhibited discriminatory animus.  A reasonable factfinder could question an employer's stated reasons for taking action when he "has provided inconsistent or conflicting explanations for [his] conduct."  *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007).  But no reasonable factfinder could look at the evidence to which Plaintiff points and see inconsistent or conflicting explanations for why Santos was investigating Plaintiff.  The OPR report of investigation lists the "topic" as [Plaintiff] made a racial slur against BPA(I) Galarza."  The only mention of Santos in the report was recounting a conversation in which he said that Galarza and Moreno reported that Plaintiff "made racial and derogatory comments concerning" Galarza's tattoos when he allegedly asked if Galarza was a "Mara," a member of a Salvadorian prison gang.  But there is no evidence that Santos had any involvement in choosing how OPR characterized its

investigation; OPR and SET were separate entities.  How OPR chose to characterize its investigation cannot internally conflict with an explanation given by SET, an entirely different entity whose investigation had a broader purpose.  From the early stages of the SET investigation, the investigation led by Santos, the stated reasons for investigating Plaintiff included the alleged lack of candor in his initial statements, *see* D Ex. 17 at 169, and thus there was no inconsistency or conflict when Plaintiff was terminated for that reason.

### iii.    *Falsity of the Fact underlying the Proffered Reason*

Plaintiff also attempts to show pretext by disputing the fact underlying the stated reason for his termination.  In other words, he attempts to show the stated reason, that Hinojosa believed Plaintiff lacked candor, was false or unworthy of credence because Plaintiff did not in fact lack candor during the investigations.

The issue at the pretext stage in a discrimination case is whether the employer's perception, "accurate or not, was the real reason" for the action he took. *See Shackelford*, 190 F.3d at 408–09.  A plaintiff may survive summary judgment simply by creating a fact issue about whether the employer's stated reason is false. *See Reeves*, 530 U.S. at 146–48.  But the question of whether an employer's stated reason is false and the question of whether the reason is grounded in a false belief are distinct.

Title VII is "not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers."[17]   *See*

---

[17] This issue usually arises in the context of a plaintiff challenging the employer's perception of his overall performance, but the principles discussed have also been applied to a situation where a

*Bryant*, 413 F.3d at 478 (quoting *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988)).  "Our anti-discrimination laws do not require an employer to make proper decisions, only non-[discriminatory] ones."  *See LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).  In this vein, "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."  *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).  "Such evidence, alone, merely implies that an employer may have made a mistake in deciding to take action against an employee.  Because even an incorrect belief . . . [can qualify] as a legitimate reason to terminate an at-will employee, a plaintiff must offer evidence to support an inference that the employer had a [discriminatory] motive, not just an incorrect belief."  *See Haverda v. Hays Cnty.*, 723 F.3d 586, 596 n.1 (5th Cir. 2013).

Here, Plaintiff has certainly pointed to evidence that creates a genuine dispute over whether he actually lacked candor during the investigations.  But that is the only genuine dispute he has created.  Hinojosa very well may have made an incorrect decision when he terminated Plaintiff for lacking candor during the investigations, but "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision."[18]  *See Bryant*, 413 F.3d at 478.

---

plaintiff was suspended because of an accident that the employer believed was the plaintiff's fault and the plaintiff disputed whether the accident was in fact his fault.  *See Mayberry*, 55 F.3d at 1091.

[18] Perhaps it may be possible for an employer's proffered explanation to be "so unreasonable that it must be pretextual."  *See Sandstad*, 309 F.3d at 899.  The Court has not found any Fifth

## IV.   CONCLUSION

Defendant claims that Plaintiff was terminated because he lacked candor when he denied awareness of the physical training session while at the checkpoint on April 13, 2010.  Plaintiff has pointed to evidence that indicates he may not have been aware of the physical training session that day.  But Plaintiff has not pointed to any other evidence indicating that Defendant's stated reason was a pretext for race or color discrimination.   Accordingly, Defendant's Motion for Summary Judgment (Dkt. No. 63) is **GRANTED** and Plaintiff's Title-VII claims are **DISMISSED WITH PREJUDICE**.  Plaintiff's Unopposed Motion to Withdraw 42 U.S.C. § 1981 Claims (Dkt. No. 74) is also **GRANTED**.

It is so **ORDERED**.

**SIGNED** this 22nd day of May, 2014.

Marina Garcia Marmolejo
United States District Judge

---

Circuit cases discussing this possibility other than the passing mention in *Sandstad*.  In any event, no reasonable factfinder could conclude that the explanation in this case was such.